

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 1:10-cr-00044-LO |
| | ) | |
| ANDREW B. SILVA | ) | |
| | ) | |
| Defendant. | ) | |

## STATEMENT OF FACTS

The parties stipulate that the allegations in the Criminal Information and the following facts are true and correct, and that had the matter gone to trial the United States would have proven them beyond a reasonable doubt:

1. In 1997, defendant ANDREW B. SILVA inherited from his mother $250,000 in an undeclared Swiss bank account at an international bank ("the International Bank") in Zurich, Switzerland. The account was held in the name of a Liechtenstein trust.

2. Prior to her death, ANDREW B. SILVA's mother provided him with the name of a lawyer in Zurich, Switzerland ("the Zurich Attorney") who managed the account. ANDREW B. SILVA's mother instructed him not to call the Zurich Attorney but to write him a coded letter requesting a meeting.

3. In or about May 1999, ANDREW B. SILVA met with the Zurich Attorney in Zurich, Switzerland. The Zurich Attorney advised ANDREW B. SILVA that his undeclared Swiss account was worth approximately $250,000, that the account was "hush-hush," and that it would be best if he did not talk to others about it. At the same meeting, the Zurich Attorney denied ANDREW B.

SILVA's request for documentation relating to his undeclared Swiss account and told him that in order to maintain secrecy he should not have account statements in his possession. The Zurich Attorney told ANDREW B. SILVA that he had the power to withdraw funds from the undeclared Swiss account at any time and to make investment recommendations as well.

4. The Zurich Attorney advised ANDREW B. SILVA that if he transported less than $10,000 in U.S. currency back to the United States, he would not have to declare the funds to the United States government upon re-entry to the United States.

5. In or about May 1999, ANDREW B. SILVA withdrew approximately $9,000 in U.S. currency from his undeclared Swiss account with the assistance of the Zurich Attorney's secretary and transported the currency from Switzerland to the United States. ANDREW B. SILVA carried only that amount because he knew that he was obligated to declare the importation into the country of more than $10,000 in cash.

6. In or about August 2009, ANDREW B. SILVA was informed that the International Bank was closing his undeclared Swiss account and that he had until the end of the year to travel to Switzerland to withdraw all funds.

7. In or about the end of September 2009, ANDREW B. SILVA followed the arranged protocol and sent the Zurich Attorney a coded letter asking him to meet for coffee.

8. On October 12, 2009, ANDREW B. SILVA met with the Zurich Attorney in Zurich, Switzerland, to discuss closing his undeclared Swiss account. At that time, it was worth approximately $268,000. In that meeting, the Zurich Attorney informed ANDREW B. SILVA that the Zurich Attorney would not be involved with a wire transfer of funds, and the International Bank would not wire transfer the contents of his undeclared Swiss account to the United States because a

wire transfer would create a trail for U.S. authorities regarding the undeclared Swiss account. He advised ANDREW B. SILVA that ANDREW B. SILVA had to withdraw the funds in cash.

9. ANDREW B. SILVA informed the Zurich Attorney that he would withdraw cash from his undeclared Swiss account and mail the currency to his home in Sterling, Virginia, in envelopes containing less than $10,000. The Zurich Attorney counseled ANDREW B. SILVA to send the mail from numerous Swiss Post offices in order to avoid detection by U.S. authorities. The Zurich Attorney caused ANDREW B. SILVA to be provided with internet print-outs showing the locations of four separate Swiss Post offices in Zurich within an approximately four mile radius of each other. The Zurich Attorney advised ANDREW B. SILVA to stagger the sending of the envelopes containing U.S. currency via both regular and priority mail so that the envelopes would not arrive in the United States at the same time. The Zurich Attorney had his secretary inspect the envelopes ANDREW B. SILVA intended to use to mail U.S. currency to the United States to ensure that the envelopes did not look suspicious.

10. On October 12, 2009, the Zurich Attorney's secretary took ANDREW B. SILVA to meet a banker ("the Swiss Banker") at the private banking office in Zurich, Switzerland, of one of the largest international banks in the world to discuss his undeclared Swiss account.

11. The Swiss Banker informed ANDREW B. SILVA that the International Bank was closing down all accounts held by United States citizens and residents. The Swiss Banker counseled ANDREW B. SILVA that the International Bank would not wire transfer money to the United States because doing so would leave traces of his undeclared Swiss account. Instead, the Swiss Banker provided ANDREW B. SILVA with $115,000 in U.S. currency consisting of an individually wrapped "brick" of $100,000 in sequentially numbered, new $100 bills, and a second bundle

containing sequentially numbered, new $100 bills totaling $15,000. The Swiss Banker informed ANDREW B. SILVA that the International Bank could not provide him with more cash at that time.

12. On or about October 12 and 13, 2009, ANDREW B. SILVA mailed $105,700 in U.S. currency in approximately 13 envelopes each containing under $10,000 from Swiss Post offices in Zurich, Switzerland to his residence in Sterling, Virginia. Each envelope contained new, sequentially marked $100 bills taped inside a travel brochure. ANDREW B. SILVA included no more than $10,000 in cash in each package because he knew that he was obligated to declare the importation into the country of more than $10,000 in cash and he did not want any one package to include more than $10,000 in cash so that no examination of any one package would reveal his failure to declare his importation of the entire $105,700 that he mailed from Switzerland to the United States.

13. On October 13, 2009, defendant ANDREW B. SILVA transported approximately $9,000 in U.S. currency from Switzerland to the United States.

14. In or about November 2009, ANDREW B. SILVA sent a coded letter from the Eastern District of Virginia to the Zurich Attorney requesting that the two "meet for coffee."

15. On or about November 20, 2009, during a meeting in Zurich, Switzerland, the Zurich Attorney provided ANDREW B. SILVA with a package containing $120,000 in U.S. currency consisting of an individually wrapped "brick" of $100,000 in sequentially numbered, new $100 bills and a second bundle containing sequentially numbered, new $100 bills totaling $20,000. The Zurich Attorney showed ANDREW B. SILVA statements of the undeclared Swiss account at the International Bank but did not provide him with copies, and counseled him not to carry copies because doing so could lead to the discovery of the account by U.S. authorities.

16. Between on or about November 20 and November 22, 2009, ANDREW B. SILVA mailed a total of approximately $100,000 in U.S. currency in 12 envelopes from Swiss Post offices in Zurich, Lucerne, and Geneva, Switzerland to his residence in Sterling, Virginia. At the same time, he mailed an envelope containing U.S. currency in an amount under $10,000 from a Swiss Post office to a residence in the Western District of Wisconsin. ANDREW B. SILVA intended to include no more than $10,000 in cash in each package because he knew that he was obligated to declare the importation into the country of more than $10,000 in cash and he did not want any one package to include more than $10,000 in cash so that no examination of any one package would reveal his failure to declare his importation of the more than $100,000 that he mailed from Switzerland to the United States. By mistake, he inadvertently included $12,600 in one of the envelopes.

17. ANDREW B. SILVA returned to Dulles International Airport on November 23, 2009, carrying approximately $9,000 in cash on his person. ANDREW B. SILVA carried only that amount because he knew that he was obligated to declare the importation into the country of more than $10,000 in cash and he wanted to conceal from United States government officials that he was in the process of importing more than $100,000 from Switzerland to the United States (including the amounts he had mailed the prior days, and the amount he was carrying on his person).

18. Upon his arrival at the airport, ANDREW B. SILVA was questioned by a U.S. Customs Inspector. In response to questions from the Customs Inspector, ANDREW B. SILVA falsely denied that he had recently mailed any U.S. currency from Switzerland into the United States.

19. ANDREW B. SILVA and the Zurich Attorney agreed to the plan to structure the importation of U.S. currency in amounts less than $10,000 for the purpose of evading currency reporting requirements. To implement that plan, ANDREW B. SILVA mailed approximately 25

5

packages of cash from Switzerland to the United States, totaling in the aggregate approximately $210,000 in cash, and carried from Switzerland to the United States approximately an additional $18,000 in cash.

20. For the years 1997 through 2008, ANDREW B. SILVA failed to disclose the existence of the Swiss account to his tax return preparer. As a result, the account was not declared on Schedule B of his individual income tax returns Form 1040, no income earned on that account was included on his individual income tax returns Form 1040, and no Foreign Bank Account Reports ("FBARs") were filed with the Department of the Treasury with respect to the Swiss account.

21. ANDREW B. SILVA engaged in all of the aforementioned conduct pursuant to an agreement with the Zurich Attorney, the Swiss Banker, and others, and with the intent to defraud the United States and the Internal Revenue Service in violation of Title 18, United States Code, Section 371.

22. The acts taken by the defendant, ANDREW B. SILVA, in furtherance of the offense charged in this case, including the acts described above, were done knowingly and not by accident or mistake.

Respectfully submitted,

Neil H. MacBride
United States Attorney

Kevin M. Downing
Senior Litigation Counsel

John Sullivan
Mark F. Daly
Trial Attorneys
United States Department of Justice,
Tax Division

By: _____
Gordon Kromberg
Assistant United States Attorney

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, ANDREW B. SILVA, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
ANDREW B. SILVA, Defendant

I am ANDREW B. SILVA's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
Christopher S. Rizek
Caplin & Drysdale
Attorney for Defendant, ANDREW B. SILVA